The **UNITED STATES**

v.

**Opal Doris HOGUE.**

**Crim. No. 25166.**

United States District Court
N. D. Georgia,
Atlanta Division.

Jan. 18, 1968.

Charles B. Lewis, Jr., Asst. U. S. Atty., Atlanta, Ga., for plaintiff.

Charles R. Smith, Atlanta, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

Defendant in this case has been indicted for the possession of 3,365 gallons of illegal liquor, in violation of 26 U.S.C.A. §§ 5205(a) (2) and 5604(a) (1), and for possessing 4,000 pounds of sugar, in violation of 26 U.S.C.A. § 5686. She has also been indicted for having concealed some 2,166 gallons of the above illegal liquor, in violation of 26 U.S.C.A. § 5601 (a) (12).

Defendant has moved to suppress the evidence of the offenses, namely, the illegal liquor and sugar, on the ground that it was discovered in the course of an illegal search in violation of the Fourth Amendment.

Based on the transcript of the hearing before the United States Commissioner, and two full hearings in court,[1] the facts are as follows:

At approximately 11:00 P.M. on the evening of March 4, 1967, two men came to the home of defendant on what may best be described as a social visit. Defendant lives on a country road in Henry County, Georgia, near the City of Atlanta and just across the Clayton County line. A small frame house of the type frequently found in rural areas, a garage-type building, and a small barn are located on the property, the three buildings forming a very obtuse triangle. As the two men drove into the backyard area of the house, they noticed that the tail lights of a car parked in the yard were on. As they came to a stop, the tail lights went out. The men knocked on the back door of the house but were unable to rouse anyone. One of the men had talked with Mrs. Hogue on the telephone some twenty minutes earlier and she was supposed to be expecting them. On then examining the car, they noticed that the doors were locked, the key was in the ignition, the dome light was on, and a large object was concealed under a blanket on the floor of the back seat. At about this time, a Negro man drove into the yard and a brief conversation ensued, the man never leaving his own car. The Negro man then drove off, and on re-examining

1. The second court hearing was called, not only to resolve certain factual questions which were unanswered, but to explore a lingering suspicion of collusion that the record at that point did not dispel. There is now no indication of any collusive acts on the part of any of the law enforcement agencies concerned.

the parked car, the original two men noticed that whatever had been in the back seat had unaccountably disappeared, leaving the blanket behind.

The two men then drove to a nearby motel, called the Clayton County police, and told them that they thought there was a body in a car at the Hogue place. (The house is within a hundred yards of the Clayton County line, and apparently no one realized in the dark and under the stress of the moment in just what county the house was situated.) The local police promptly responded and followed the two men to the Hogue place. They first examined the car which was parked in the yard near the garage (which was between the house and the barn) and found what the two men had earlier seen: a locked car and a blanket. At the same time, they noticed a strong smell of alcohol in the area. (The first two men had not noticed this; they had been drinking themselves and perhaps were not as sensitive to the smell of alcohol as were trained police officers.) At this point, the officers knocked on the door of the house, but no one answered. Upon a further exploration of the general area, a cache of white plastic gallon milk jugs of the type commonly used in this area for retailing illegal liquor was discovered under a small shed whose only wall was the outer side wall of the garage. The jugs were partially covered with a piece of tarpaper and would not have been visible unless someone had been conducting at least a cursory examination of the area. (A leak in one or more of these jugs was the source of the alcohol smell.) On opening one of the jugs, it was found to contain illegal liquor. A horse trailer, unattached to any vehicle and standing next to the garage, was then checked and two one-gallon jugs of illegal liquor were found. More was found in the back of a 1½ ton truck standing next to the trailer. Still more liquor and the sugar were found in a crib attached to the side of the barn and in the barn itself. A federal officer was then notified, who arrived shortly and succeeded in getting Mrs. Hogue, *en deshabille,* to the door. She was then arrested. At no time did any of the officers have either a search warrant for the premises or an arrest warrant for Mrs. Hogue.

■ At the outset it might be noted that the evidence does not support the Government's attempt to place at least the initial discovery within the so-called "plain view" rule, applied in Burt v. United States, 139 F.2d 73 (5th Cir., 1943).

■ Nor does the fact that it was state and not federal officers who made the search aid the Government. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). The fact that the search was made by Clayton County officers, who at the time were actually in Henry County and concededly out of their jurisdiction by state law (Georgia Code § 23–1403), is immaterial. Although there is an absence of precise authority, the court believes the *Elkins* rule is not meant to turn on such niceties, but is governed by whether the searching officers were acting, as here, *ex colore officii.* To rule, as the Government has rather weakly suggested, that the Clayton County officers, when outside of their state-granted jurisdiction, were merely private citizens and hence the federal government may freely use anything that was discovered, would open the door to the grossest sort of abuse. On this point, the court sees no way in which the reasoning of Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), can be stretched to cover the facts here.

■ Nor would the smell of moonshine alone, in these circumstances, have justified the ensuing warrantless search. Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

■■ However, the circumstances of this case, viewed as a whole, and weighed against the standard of whether the of-

ficers' conduct was reasonable, strongly indicate that the search was not unreasonable.

> "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (Section II of the opinion).

The only evidence before the court unmistakably shows that the officers were making a bona fide investigation of a reported serious crime when they entered on the property. While in retrospect, and on a close examination of the actual facts, the crime in question might not logically appear to be one involving death (since whatever was in the car had apparently disappeared under its own means of locomotion), we do not believe police officers are required to view reports of possible bodies in cars with a jaundiced eye and subject the report and reporter to a close and critical examination before deciding whether to drive down the road and see for themselves. Especially would the police be justified in proceeding in haste on receiving this kind of report where, as here, the occupant of the house, a lone woman who was supposed to be at home, unaccountably does not answer the door in the middle of the night. Then, after having arrived at the premises and confirmed that the occupant did not answer the door, a cursory examination of the immediate vicinity and unlocked outbuildings and vehicles would seem to have been completely in

order. If a serious crime had been committed, either the "body", dead or seriously injured, might have still been in the vicinity, or the culprit might have been found. And even if the evidence available to the police at the time they received the first report had been carefully analyzed, it still would have justified a conclusion that an attempted car theft or some other crime might still be in progress. In any event, the circumstances, viewed as a totality, justified the ensuing search.

That moonshine was smelled in the barnyard did not obviate the possibility that there was some other serious crime in progress which might be prevented or whose perpetrator might be found if an immediate search were made. Indeed, the smell of moonshine might have convinced the officers that the original report might be well founded, since it is commonly known that one type of crime breeds other offenses.[2] Surely it was not necessary for the officers to stay their hand in immediately investigating a bona fide report of a serious crime merely because they should have suspected that their search would probably turn up some illegal liquor. All of the places in which liquor was found could reasonably have been thought to be hiding places for a person, dead or alive. That the liquor was found was purely fortuitous. Therefore, there is no basis for ruling that the search was in violation of Fourth Amendment standards.

The motion to suppress is therefore denied, as to each and every article of contraband found.

---

2. Considering the conflicting testimony of what one officer (of the three making the search) thought he was looking for after he smelled the alcohol, the court does not consider the alleged motivation to be of great weight. It is conduct that must be judged, not the subsequent reconstruction of a rationale that must have undergone several rapid changes in a relatively short period as new facts were presented to the officers.