UNITED STATES of America,
Plaintiff–Appellee,

v.

Oscar ORTIZ, Defendant–Appellant.

No. 02–30098.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 2, 2004.

Filed April 7, 2004.

Teresa A. Hampton, Hampton & Elliott, Boise, ID, for the defendant-appellant.

Lynne W. Lamprecht (argued) and Kim R. Lindquist, Assistant United States Attorneys, Boise, ID, for the plaintiff-appellee.

Before O'SCANNLAIN, RYMER, and BYBEE, Circuit Judges.

RYMER, Circuit Judge.

We write to clarify the proper standard for determining relevant conduct for jointly undertaken criminal activity under USSG § 1B1.3(a)(1)(B) as amended in 1992: the conduct must be *both* in furtherance of jointly undertaken activity *and* reasonably foreseeable. This differs from the standard we previously adopted for determining relevant conduct under the *1990* version of the guidelines—that each conspirator is to be held accountable for conduct that he reasonably foresaw *or* which fell within the scope of his particular agreement. *See United States v. Gutierrez–Hernandez,* 94 F.3d 582, 585 (9th Cir. 1996) (applying USSG § 1B1.3, cmt. (n.1) (Nov.1990)). The reason for the difference is that commentary to § 1B1.3 was amended in 1992 to embrace a conjunctive test. USSG App. C, Amendment 439, commentary to § 1B1.3 Application Note 2 (1992). Accordingly, to eliminate confusion, we now hold that for sentencings governed by the revised guidelines which became effective November 1, 1992, district courts must make two findings in order to attribute the conduct of others to a defendant under § 1B1.3(a)(1)(B): that the conduct was in furtherance of jointly undertaken criminal activity, *and* that it was reasonably foreseeable in connection with that activity.

Oscar Ortiz's sentence was based in part on relevant conduct of a co-conspirator under § 1B1.3(a)(1)(B) of the 2001 Guidelines Manual. He challenges this determination because, in his view, there was no joint activity and the district court incorrectly cited *Gutierrez–Hernandez.* While we agree that *Gutierrez–Hernandez* was not controlling, the citation itself was harmless for we are satisfied that the district court found that there was jointly undertaken criminal activity *and* that a co-conspirator's sale of drugs and use of a firearm were reasonably foreseeable.

As Ortiz's remaining arguments also fail, and we have jurisdiction under 28 U.S.C. § 1291, we affirm.

I

Ortiz ran a drug operation based in Twin Falls, Idaho, that merged with an

organization run by Francisco Ramos in the Boise–Nampa area around November 1999. Ramos made three deliveries of methamphetamine, totaling over thirteen pounds, to an undercover agent after the merger and before he was arrested in 2001. He placed a .40 caliber semiautomatic handgun on the table during one of these encounters. A tip by an associate led to Ortiz, who was indicted with others for conspiracy to distribute methamphetamine, drug possession/ distribution, and misprision of felony, all in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). Ortiz was convicted on all three counts on December 13, 2001 following trial to a jury.

At sentencing, the district court adopted the findings of the Presentence Investigation Report (PSR). The PSR described the offense conduct in great detail, including Ortiz's involvement in, and knowledge of, the scope of the merged conspiracy. The court determined that Ortiz was accountable for Ramos's deliveries of over thirteen pounds of methamphetamine to undercover agents and use of a gun in conjunction with drug activities. The court also adjusted Ortiz's offense level upward under USSG § 3B1.1(a) for being an organizer or leader of criminal activity involving at least nine participants. With an offense level of 42 and a criminal history category of II, he was sentenced to 360 months.

Ortiz timely appeals his conviction, claiming that the government improperly vouched for its witnesses, and his sentence.

## II

Ortiz argues that the district court misinterpreted USSG § 1B1.3 (2001) by finding that it was reasonably foreseeable that Ramos would sell the thirteen pounds of drugs in the context of the overall conspiracy without also finding that Ortiz and Ramos had an agreement to undertake the sale of these drugs in Nampa. He submits that the court incorrectly cited *Gutierrez–Hernandez* because *Gutierrez–Hernandez* relied upon the 1990 version of the guidelines, which allowed for the quantity of drugs attributable to a defendant to be based upon the scope of his particular conspiracy *or* the quantity of drugs he reasonably foresaw.

The government agrees that the 1992 guidelines clarify § 1B1.3 and its commentary by replacing the disjunctive "or" with the conjunctive "and." However, its position is that the district court's determination accurately reflects the appropriate standard and its application to the facts, regardless of the erroneous citation to *Gutierrez–Hernandez*.

*Section 1B1.3 provides for a defendant's offense level* to be determined on the basis of all of his own acts and, in the case of jointly undertaken activity,

> all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

In the version of the guidelines that was before the court in *Gutierrez–Hernandez*, Application Note 1 to § 1B1.3 explained:

> Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.

USSG § 1B1.3, cmt. (n.1) (Nov.1990). We held in *Gutierrez–Hernandez* that under this guideline, "each conspirator is to be judged on the basis of the quantity of

drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators, rather than on the distribution made by the entire conspiracy." 94 F.3d at 585 (citing *United States v. Petty*, 982 F.2d 1374, 1376 (9th Cir.1993)).

The commentary was amended effective November 1, 1992. In the amended (and current) version that applied to Ortiz's sentencing, the application note states:

> In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:
>
> (i) in furtherance of the jointly undertaken criminal activity; and
>
> (ii) reasonably foreseeable in connection with that criminal activity.

USSG § 1B1.3, cmt. (n.2) (Nov.2001).

Thus, in its post–1992 form, the relevant conduct guideline for jointly undertaken criminal activity is to operate *conjunctively*. This means that our formulation of the standard based on the 1990 version of § 1B1.3 in *Gutierrez–Hernandez* is of limited effect. Given the amendment, the *disjunctive* standard applies *only* to sentencings under the pre–1992 guidelines.

■ Although we have cited *Gutierrez–Hernandez's* formulation since the 1992 revision to § 1B1.3's commentary, *see, e.g., United States v. Banuelos*, 322 F.3d 700, 702, 704 (9th Cir.2003), the outcomes of those cases have not required the application of *Gutierrez–Hernandez's* disjunctive formulation. *See id.* at 704 ("[The defendant] does not dispute that the district court conducted the proper substantive inquiry here."). Indeed, post-*Gutierrez-Hernandez*, we have imposed the conjunctive interpretation despite our admittedly confusing citations to the language of *Gutierrez–Hernandez*. *See United States v. Whitecotton*, 142 F.3d 1194, 1198 (9th Cir. 1998) (citing *Gutierrez–Hernandez* but

then emphasizing the commentary's "explicit" requirement that acts be *both* in furtherance of the jointly undertaken criminal act *and* reasonably foreseeable). To the extent, however, that we have not squarely addressed *Gutierrez–Hernandez's* applicability to sentencings under the 1992 revision, we do so here. With that issue straightforwardly presented, we join other circuits to have considered the same question in holding that a district court must find that the conduct of others was *both* jointly undertaken *and* reasonably foreseeable for § 1B1.3(a)(1)(B) as revised in 1992 to apply. *See United States v. Studley*, 47 F.3d 569, 574 (2d Cir.1995); *United States v. Saro*, 24 F.3d 283, 288 (D.C.Cir.1994); *United States v. Jenkins*, 4 F.3d 1338, 1346–47 (6th Cir.1993); *United States v. Evbuomwan*, 992 F.2d 70, 74 (5th Cir.1993); *United States v. Gilliam*, 987 F.2d 1009, 1013 (4th Cir.1993).

■ Having clarified that the standard for applying the revised § 1B1.3 is conjunctive, the next question is whether the district court correctly determined that Ortiz was accountable for Ramos's deliveries notwithstanding its incorrect citation to *Gutierrez–Hernandez*. We conclude that it did. The court adopted the PSR which distinctly found that Ortiz was responsible for the thirteen pounds delivered by Ramos because they were in furtherance of the conspiracy in which Ortiz was involved *and* of which he had knowledge. This leaves only Ortiz's contention that he remained at home in Twin Falls and was not involved with the Ramos conspiracy in Nampa, but the jury, the PSR, and the sentencing judge found otherwise.

### III

■ Ortiz argues for essentially the same reasons that Ramos's display of a firearm during one of the deliveries in the Boise–Nampa area, and on another occa-

sion to force a co-conspirator to apologize to Ortiz, was not relevant conduct for purposes of increasing his offense level under USSG § 2D1.1(b)(1). In addition to findings we have already discussed, the court found that Ortiz knew that Ramos always carried a gun. It does not matter that Ortiz was not personally present when the firearm was used, so long as its use was reasonably foreseeable and furthered jointly undertaken criminal activity. The district court found this was so, and could properly increase Ortiz's offense level for Ramos's possession of a firearm.

## IV

■ Again for the same reasons, Ortiz contends that the court erred by increasing the offense level for his role in the offense pursuant to USSG § 3B1.1. His theory is that this increase was based upon the same error in interpreting relevant conduct. Ortiz recognizes that our review is for plain error, *United States v. Olano*, 507 U.S. 725, 731–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), because he failed to object on this basis at sentencing. As we have already determined, there was no error.

## V

■ On appeal, but not at trial, Ortiz claims that the Assistant United States Attorney (AUSA) improperly vouched for the credibility of the government's witnesses by pointing to their plea agreements, highlighting that the witnesses would tell the truth, and suggesting that the jury should come to the same conclusion that the government did about the witnesses' credibility. "Improper prosecutorial vouching occurs when the prosecutor places the prestige of the government behind the witness by providing personal assurances of the witness's veracity." *United States v. Smith*, 962 F.2d 923, 933 (9th Cir.1992) (internal quotations and alterations omitted). We see no plain error

in simply eliciting on direct examination a witness's obligation through a plea agreement to tell the truth.

■ *See, e.g., United States v. Necoechea*, 986 F.2d 1273, 1278–79 (9th Cir.1993) (discussing factors to consider, and holding that a prosecutor's eliciting testimony on direct examination regarding the truthfulness provision of a plea agreement does not alone mean that vouching has occurred). This accounts for most of the conduct about which Ortiz now complains. However, we do believe that the AUSA vouched for Amber Vergel by implying that the court would determine the truthfulness of her testimony, and for all of its witnesses by suggesting in argument that he or the court would know whether these witnesses gave truthful testimony.

Vergel was asked on direct examination:
Q: What's your understanding of the plea agreement as far as who ultimately will make the final decision as to what punishment you'll receive?
A: The judge.
Q: Who ultimately will have to evaluate the truthfulness of your statements and the extent of your cooperation?
A: The judge.
Q: And you understand that the Government, I, might make a recommendation, but ultimately it's up to the Court to decide all of those things; isn't that correct?
A: Yes.

The AUSA closed by arguing:
And remember the testimony of all of those witnesses. Who ultimately will have the responsibility of determining the propriety of their cooperation, the truthfulness of their statements? The Court. The United States will make a recommendation. I certainly will state my perception as far as what they have done, but ultimately the Court will make

the determination as to whether or not that cooperation has been appropriate and their testimony truthful in this crucible.

And that's just exactly what this trial is. And if you haven't appreciated that significance, take nothing else out of this courtroom when you leave, but that. That what we try to do with a trial is to create a crucible of truth, a crucible of truth. To bring all of the parties to bear, to bring all of the factors to bear. To bring people in that have knowledge about this and allow you to look at it and make your determinations. That's the crucible.

And if you believe that in that crucible these people are simply getting away with murder, if you will, that justice is not being done, then you must, as the Judge instructed you in these instructions, you must consider their testimony with more caution. And you know, I don't have any qualms about that instruction because the law is simply asking you to do just exactly what the agents did. When Amber Vergel first walked up and the attorney said, "Look, this is what she's going to say," as the agents testified, we took that with a grain of salt. . . .

 The vice in both instances is the implication that the court, as well as law enforcement, can, has, and will monitor the witnesses' truthfulness. Whether the witnesses have testified truthfully, of course, is entirely for the jury to determine; it is improper to communicate that a credibility determination has been made by the AUSA, law enforcement agents, or the court, or that the government knows whether the witness is being truthful and stands behind the veracity of the witness's testimony. *See, e.g., United States v. Shaw,* 829 F.2d 714, 717 (9th Cir.1987); *United States v. Kerr,* 981 F.2d 1050 (9th Cir.1992). At the same time, the statements here do not refer to anything out-side the record or directly express a personal opinion. The defense did attack the credibility of the government witnesses on account of their incentive to curry favor. The court instructed the jury to view these witnesses' testimony with great caution, and with greater caution than that of other witnesses, because they had received favored treatment from the government. The AUSA emphasized this instruction in closing argument. And evidence from two law enforcement officers corroborated much of the cooperating witnesses' testimony. On balance, and in light of all the evidence, we cannot say that the improper statements, though vouching, warrant reversal for plain error.

AFFIRMED.