**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

MATTHEW STAFFORD,
              *Defendant-Appellant.*

No. 04-30134

D.C. No.
CR-03-00169-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, Chief U.S. District Judge, Presiding

Submitted April 6, 2005*
Seattle, Washington

Filed August 3, 2005

Before: William C. Canby, Jr., Richard C. Tallman, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Canby

---

*This panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

**COUNSEL**

David B. Koch, Nielsen, Broman & Koch, PLLC, Seattle, Washington, for the defendant-appellant.

Michael J. Lang, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

## OPINION

TALLMAN, Circuit Judge:

On the afternoon of January 22, 2003, Snohomish County, Washington, Sheriff's officers responded to a report of a possible dead body inside what witnesses described as a blood-spattered apartment in a state of disarray. In the course of looking for a possibly injured or deceased person, the deputies saw two assault rifles, a suspected grenade launcher, ammunition, and photographs of a man apparently injecting drugs intravenously while sitting in the bathroom of what appeared to be the same apartment.

As a result of this entry, observation, and subsequent seizure of the weapons, Matthew Stafford was charged with and convicted of two counts of unlawful possession of a firearm. He was sentenced to 72 months of imprisonment. On appeal, he challenges the district court's denial of his motion to suppress evidence obtained during the warrantless search. He also argues that, in light of *United States v. Booker*, 125 S. Ct. 738 (2005), his sentence constitutes plain error. We hold that the warrantless entry was reasonably justified by the emergency doctrine, and that the rifles and ammunition seized were properly admitted into evidence under the plain view exception to the Fourth Amendment's warrant requirement. We remand the case to permit the district court to consider whether it would have sentenced Stafford differently under the advisory, rather than the mandatory, United States Sentencing Guidelines. *See United States v. Ameline*, 409 F.3d 1073, 1084 (9th Cir. 2005) (en banc). Accordingly, we affirm the district court's denial of Stafford's motion to suppress and remand pursuant to *Ameline*.

I

On January 22, 2003, fire alarm technician Day was performing a pre-scheduled annual fire alarm check in every unit

at an apartment complex. The checks were uneventful until he reached unit F-202, where he noticed a strong odor, "like a dog, or organic," emanating from behind the front door. He entered the unit. After testing the fire alarm in the living room, he entered the master bedroom to test the second fire alarm. He encountered some difficulty entering because the door to the bedroom appeared to have been kicked in and was blocked on the other side by a container. When he was able to get through, he noticed that the strange odor intensified and that the room was splattered and smeared with large quantities of blood and feces — on the wall, on the floor, on a bunch of bloody rags — and that it looked as though "there had been a brawl." He peeked into the unlit bathroom, in a similar condition, whereupon the smell became overpowering. He also noticed what appeared to be a bunsen burner as well as hundreds of needles.[1] Upon seeing this, he became worried that there might be a dead body in the unit and felt that he had to leave the apartment and call maintenance because this was an issue "of grave concern."

Day immediately told the maintenance person, Atkinson, that they should call the police because there could be a dead body or a methamphetamine laboratory in the unit, and that he had not had a chance to view much of the bathroom before exiting. Atkinson peeked in and agreed with Day that there could be a dead body inside. Atkinson then contacted the property manager, who called 911 and relayed their concerns and a description of the unit's interior to the sheriff's dispatcher.

Snohomish County Deputy Sheriff Bond was the first officer to arrive at around 2:32 p.m. He spoke with the manager and confirmed the witness reports of blood, feces, needles, a strong odor, and a possible dead body in unit F-202. Shortly thereafter, Deputy Haley arrived and was briefed by Bond and

---

[1]He also testified that he saw a rifle clip in the closet on his way to the bathroom.

the others. Following department policy for calls involving a possible dead body, Deputy Bond called for a supervising sergeant because he thought that the situation might require a "forced entry." While waiting for the sergeant to arrive, Deputies Bond and Haley performed checks of license plates associated with the unit to determine more information about what they might be facing and to try to identify the resident or victim in the apartment.

All three officers entered unit F-202 when the sergeant arrived, less than thirty minutes after Deputy Bond first responded to the call. All of the officers entered with their weapons drawn because they did not know what to expect inside. At the suppression hearing, the officers testified that their primary concern was the possibility of locating a victim inside unit F-202.

The officers first cleared the kitchen, alcove, and living room. Before entering the master bedroom, Deputy Haley noticed a single, green-tipped bullet which he knew to be consistent with armor-piercing ammunition. The master bedroom contained two closed doors. Deputy Haley opened one of the doors to a closet, and saw the barrels of two military AR-15 assault rifles behind a storage container. On top of the storage container was a military-style camouflage bulletproof vest and a magazine of 9 mm handgun ammunition; all of this ammunition was also green-tipped. The officers then proceeded to the second door, which led to the bathroom. Blood and feces were smeared on every surface in the bathroom and there was a trash bag full of bloody bandages and hypodermic needles in the corner. The counter and floor were littered with needles and other drug paraphernalia. Additionally, the officers found photographs of a white male sitting on a chair in what appeared to be the bathroom in unit F-202, portrayed in a similar state of disarray. The man had a belt around his arm and was injecting what appeared to be intravenous drugs; there was blood streaming down his arm from the needle site, and a handgun rested on the countertop.

After securing the area and satisfying themselves that, despite the odor, no one remained inside the unit, the officers removed the weapons from the closet. While removing the magazines from each of the rifles for safety purposes, they noticed that this ammunition was green-tipped as well. They also discovered that one of the rifles had what looked like a grenade launcher mounted on it with the serial number obliterated. They took custody of the weapons because they believed that they were contraband and because they were concerned that the man depicted as using drugs in the photographs would return.

Stafford was later identified as the man in the photographs and a co-inhabitant of the unit. He was charged with two counts of unlawful possession of a firearm in violation of 18 U.S.C. §§ 922(g)(3), 922(g)(9), and 924(a)(2). He moved to suppress the evidence obtained from unit F-202, arguing that it was the product of an unreasonable search. The district court denied the motion after an evidentiary hearing. Stafford subsequently entered a conditional guilty plea and was sentenced to 72 months of imprisonment. This appeal followed.

## II

### A

We review the lawfulness of a search and seizure *de novo*, and we review the findings of fact underlying the district court's determination of lawfulness for clear error. *United States v. Deemer*, 354 F.3d 1130, 1132 (9th Cir. 2004).

#### 1

**[1]** Generally, the Fourth Amendment prohibits officers from entering and searching a residence without first obtaining a warrant. *United States v. Cervantes*, 219 F.3d 882, 887 (9th Cir. 2000); *see also United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992) ("The Fourth Amendment incorpo-

rates a strong preference for search warrants.") (citation omit-ted). There exists, however, a narrow set of rigorously guarded exceptions to this warrant requirement. One such exception is the emergency doctrine, which we recently recognized and adopted in *Cervantes*. 219 F.3d at 887-89.

**[2]** The emergency doctrine allows law enforcement officers to enter and secure premises without a warrant when they are responding to a perceived emergency. *Id.* at 888; *see also Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (noting that "[nu]merous state and federal cases" have recognized that police may respond to emergency situations without a warrant) (internal citations omitted). The emergency doctrine is based on and justified by the fact that, in addition to their role as criminal investigators and law enforcers, the police also function as community caretakers. *Cervantes*, 219 F.3d at 889; *see also Mincey*, 437 U.S. at 392 (noting that the Court did "not question the right of the police to respond to emergency situations"); *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) (discussing the community caretaking function of police officers).[2]

**[3]** The following three requirements must be satisfied in order to justify a warrantless search under the emergency doctrine:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

---

[2]Additionally, just because "protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Dombrowski*, 413 U.S. at 447 (citation omitted) (finding search reasonable where the officers seized a weapon, rather than posting a guard, to ensure that it was not removed from the scene).

(2) The search must not be primarily motivated by intent to arrest and seize evidence.

(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Cervantes*, 219 F.3d at 888 (quoting *People v. Mitchell*, 347 N.E.2d 607, 609 (N.Y. 1976)). We judge whether or not the emergency exception applies in any given situation based on the totality of the circumstances, and, as with other exceptions to the warrant requirement, the Government bears the burden of demonstrating that the search at issue meets these parameters. *See Carbajal*, 956 F.2d at 930. We recognize that this doctrine could be abused to serve as a guise for warrantless, otherwise unreasonable entries, but hold that the requirements established in *Cervantes* are sufficient to ensure that, despite dispensing with the otherwise preferred warrant, these entries comport with the Fourth Amendment.

a

**[4]** We must first examine whether the report of a possible dead body in an apartment unit covered in blood and feces with needles littering the floor gave the officers a reasonable belief that an emergency was at hand and that assistance was necessary. The district court found that it did. We agree. Our holding is supported by our sister circuits who have also found that reports of possibly injured victims or dead bodies constitute an emergency.[3] Additionally, the logic behind the

---

[3]*See United States v. Holloway*, 290 F.3d 1331, 1336 (11th Cir. 2002) (noting that warrantless searches and entries are reasonable when the officers "reasonably believe that a person within is in need of immediate aid"); *United States v. Richardson*, 208 F.3d 626, 627-31 (7th Cir. 2000) (finding that a report of a raped and murdered woman constituted an emergency situation because the person could still be alive and in need of assistance); *United States v. Salava*, 978 F.2d 320, 324-25 (7th Cir. 1992) (finding that a report of a dead body justified warrantless search of a residence); *see also United States v. Hogue*, 283 F. Supp. 846, 848-49 (N.D. Ga. 1968) (finding an emergency situation where there was a specific report of a recently wounded victim, and a report of a possible dead body).

exception supports our holding because a report of a dead body can easily lead officers to believe that someone might be in need of immediate aid. *See Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963).

[5] The officers here relied on a 911 call from two people who reported that: there might be a dead body; there were large quantities of blood and feces; the master bedroom looked like there had been a "brawl"; there were copious quantities of hypodermic needles; and there was an intense, putrid smell that seemed to be coming from the bathroom. Before entering, the officers confirmed those details with the witnesses. These facts provided the officers with sufficient grounds to suspect that there was a dead body or that someone might be in need of assistance in unit F-202. The mere fact that no dead body or injured person was actually found in this case does not nullify application of the emergency doctrine. *See Holloway*, 290 F.3d at 1340 ("The fact that no victims are found, or that the information ultimately proves to be false or inaccurate, does not render the police action any less lawful.") (citation omitted). Accordingly, we hold that the first prong is satisfied.

b

[6] The second prong requires us to divine the officers' subjective motivation at the time of making the warrantless entry. *Cervantes*, 219 F.3d at 889-90. All of the officers testified at trial that they entered unit F-202 with the sole purpose of determining whether there was a dead body or an injured person in need of assistance, and the district court credited this testimony. Upon examining the record and finding no evidence to the contrary, the district court's factual determination was not clearly erroneous. *Id.* at 891 (reviewing the trial court's credibility determinations for clear error). In performing their duty as community caretakers, the officers were not primarily motivated by the desire to collect evidence.[4] We conclude that the second prong is satisfied as well.

---

[4]The fact that the officers thought that there might be evidence of drug use in F-202 does not bar application of the emergency doctrine. *See, e.g.,*

c

**[7]** The third and final prong of the emergency doctrine requires that "an officer's search must be limited to only those areas necessary to respond to the perceived emergency." *Id.* at 890. We find that this prong is satisfied from the limited scope of the search. Day and Atkinson both entered unit F-202, told the manager that this was the unit at issue, and then confirmed for the officers their observations and the reasons for their concerns. The search was conducted in a manner and scope appropriately tailored to the basis for the emergency entry.

**[8]** We conclude that the district court properly applied the emergency doctrine in this case, and correctly found that the available facts justified the officers' warrantless entry into and search of unit F-202. The officers reasonably believed, based on statements obtained from Day and Atkinson, that there was possibly a dead body inside the unit, and they could reasonably fear that someone was possibly injured inside, as well. Additionally, the officers' testimony (combined with the information that they had from Day and Atkinson) shows that their primary purpose for entering the unit was to determine whether there was a dead or injured person, not to obtain evidence. Accordingly, the search was reasonable and the officers were lawfully searching unit F-202 because of the emergency at hand.

Stafford argues that the Government failed to show that a telephonic warrant was either unavailable or impracticable under the circumstances, relying on *United States v. Alvarez*, 810 F.2d 879 (9th Cir. 1987), a case involving exigent circumstances rather than the emergency doctrine (which was

---

*Cervantes*, 219 F.3d at 886-87, 891 (applying the emergency doctrine where the officers also suspected methamphetamine production, so long as their primary motivation was not to obtain evidence).

not recognized by our court until 13 years later in *Cervantes*). This burden, however, is not part of the emergency doctrine as enunciated in *Cervantes*, nor has this showing been required in our precedent applying the doctrine. *See Cervantes*, 219 F.3d at 888; *United States v. Bradley*, 321 F.3d 1212, 1214 (9th Cir. 2003); *Deemer*, 354 F.3d at 1132; *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005).[5]

2

**[9]** Having determined that the warrantless entry was justified by the emergency doctrine, we must next resolve the issue of whether the evidence seized from unit F-202 was properly admissible at trial. "[T]he police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey*, 437 U.S. at 393 (citations and emphasis omitted); *see also Cervantes*, 219 F.3d at 888. "To fall within the plain view exception, two requirements must be met: the officers must be lawfully searching the area where the evidence is found and the

---

[5]Even if we were to import this telephonic warrant unavailability or impracticability requirement to the emergency doctrine's requirements from the exigent circumstance context, the burden would be satisfied in this case. Less than thirty minutes passed between when the first officer arrived on the scene and when the officer, the sergeant, and a back-up officer entered the premises. During that time, Deputy Bond followed department protocol for cases involving a possible unattended death and called for a supervisor. Even *Alvarez* expressly noted that officers were permitted to delay, without trying to obtain a telephonic warrant, in order to "assemble a team [. . .] and to brief the agents involved." *Id.* at 881-82; *see also Salava*, 978 F.2d at 324-25 (noting that, in the context of exigent circumstances, an emergency "did not evaporate simply because the police deferred their entry while they took reasonable precautions to reduce the risk of serious injury to themselves or others"; officers there waited approximately seventy-five minutes); *United States v. Jones*, 635 F.2d 1357, 1362 (8th Cir. 1980) (finding that the "waiting period does not defeat the applicable exception to the warrant rule") (citation omitted). This assertion does not alter our conclusion that the warrantless entry was justified in this case.

incriminatory nature of the evidence must be immediately apparent." *Roe v. Sherry*, 91 F.3d 1270, 1272 (9th Cir. 1996) (citations omitted); *see also Horton v. California*, 496 U.S. 128, 135-37 (1990); *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987).

**[10]** The first requirement is satisfied here because, as we conclude above, the warrantless entry was justified by the emergency doctrine, thereby permitting the officers to lawfully enter unit F-202. *See Cervantes*, 219 F.3d at 888-89. The second requirement of the plain view exception, that the incriminating nature of the evidence be "immediately apparent," focuses on whether the officers had "probable cause to believe they were associated with criminal activity." *Horton*, 496 U.S. at 131 n.1; *see also Hicks*, 480 U.S. at 326-27; *Texas v. Brown*, 460 U.S. 730, 742 (1983) ("A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required.") (citation omitted); *Sherry*, 91 F.3d at 1272-73.

The determination of whether the officers had probable cause to believe that the items seized were illegal, unlawful, or associated with criminal activity is objective, but we apply it to the "actual and/or perceived belief of the law enforcement officer as he . . . engages in search and seizure." *United States v. Prim*, 698 F.2d 972, 975 (9th Cir. 1983). This standard does not require the officers to *know* that the item seized is illegal. *See United States v. Cecil*, 457 F.2d 1178, 1180 (8th Cir. 1972) (noting that, in a case involving plain view seizure of a sawed-off shotgun, "[t]he observation of the gun gave probable cause for the reasonable belief that a crime, the possession of a contraband firearm, was being committed[,]" and that there is "no rule which requires an officer to have knowledge of all the elements of the crime when he views an article which reasonably appears to be contraband") (citation omitted); *see also Horton*, 496 U.S. at 130-33 (applying the plain view exception where the officers noticed *weapons* while executing a search warrant for the *proceeds* of a robbery; the offi-

cers knew that weapons had been used in the armed robbery and seized them accordingly).

**[11]** We find that the "immediately apparent" prong is satisfied in this case; the officers had probable cause to believe that the rifles and ammunition were illegal. While checking for a body or an injured person, the officers first saw what they reasonably believed to be an armor-piercing bullet in the living room. Then, when the officers opened the closet, they saw a magazine of 9 mm armor-piercing ammunition on top of a small storage container and the barrels of two AR-15 assault rifles protruding from behind the container. When the weapons were placed on the bed, the officers noted that one of the guns had a grenade launcher with an obliterated serial number.[6]

**[12]** The officers reasonably believed that these items, found amidst the trappings of severe drug abuse, were illegal. It is illegal to possess armor-piercing ammunition (18 U.S.C. § 929), to possess an unregistered grenade launcher (26 U.S.C. § 5861), and to possess a firearm with a ground-off serial number (26 U.S.C. § 5842). Moreover, given the photographs that the officers found depicting a man in the bathroom, bleeding and injecting intravenous drugs into his arm, with a handgun resting on the counter, the officers had reason to believe that there was a possible violation of 18 U.S.C. § 922(g)(3), being a drug user or addict in possession of a firearm. Accordingly, we conclude that the "immediately apparent" prong is satisfied and, moreover, that the evidence was lawfully seized under the plain view exception and fully admissible in the prosecution of Stafford.

---

[6]The fact that the launcher was actually used to propel flares is legally irrelevant: it looked like a grenade launcher affixed to an assault weapon.

B

Finally, we address the defendant's sentencing challenge. When, as here, a defendant raises an issue on appeal that was not raised before the district court, we may review only for plain error. *See* FED. R. CRIM. P. 52(b); *see also United States v. Ortiz*, 362 F.3d 1274, 1278 (9th Cir. 2004). This standard requires that there be: 1) an error; 2) that is plain; and 3) that affects substantial rights. *Jones v. United States*, 527 U.S. 373, 389 (1999). Moreover, in order to warrant relief, we must find that the error "seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (internal citations and quotation marks omitted).

During Stafford's sentencing, the district court took into account the circumstances of Stafford's failure to appear at his original sentencing hearing. Specifically, after appearing at the suppression hearing and entering a conditional guilty plea, Stafford unhooked his monitoring device, cut off the bracelet, and fled. He remained at large for five months until law enforcement caught up with him on February 22, 2004. After being stopped for a vehicular violation, Stafford presented a false Texas driver's license in the name of "David Thorn," which he later admitted to having used to evade police during his time at-large. He then led police on a foot-pursuit, engaged in a struggle, and threatened the officers with a firearm that he claimed to have before ultimately being subdued.

The district court found his offense level to be 22, based on admissions that Stafford made in his conditional plea agreement. The district court also imposed a two-level enhancement for obstruction of justice based on Stafford's absconding from his pretrial release and his failure to appear for sentencing, and upwardly departed from criminal history category III to category IV because: 1) Stafford's criminal history did not adequately reflect the seriousness of his past criminal con-

duct; and 2) there was a strong likelihood of recidivism. The district court then imposed a sentence of 72 months' imprisonment.

**[13]** While it appears that the facts upon which the obstruction of justice enhancement was based were admitted by the defendant, we nonetheless follow *Ameline*'s "limited remand" approach. 409 F.3d at 1084; *see also United States v. Moreno-Hernandez*, No. 03-30387, 2005 WL 1560269, at *9 (9th Cir. June 5, 2005) ("a limited remand is proper in *all* pending direct criminal appeals involving unpreserved *Booker* error") (amending 397 F.3d 1248 (9th Cir. 2005)) (emphasis in original). However, because we "do not assume that every defendant will want to pursue resentencing," the district court must give Stafford the opportunity to promptly notify it that he wishes to "opt out" of the *Ameline* procedure. 409 U.S. at 1084.

### III

We determine that the warrantless entry into unit F-202 was justified under the emergency doctrine and that the evidence observed therein was properly seized and admissible under the plain view exception. Pursuant to *Ameline*, we further determine that a limited remand is required. Accordingly, we affirm Stafford's conviction and remand his sentence if Stafford wishes for the district court to reconsider whether it would have sentenced him differently under the now-advisory Guidelines.

**CONVICTION AFFIRMED and SENTENCE REMANDED.**

CANBY, Circuit Judge, dissenting in part:

I respectfully dissent from the affirmance of Stafford's conviction because I conclude that the warrantless search of the apartment was not justified by the emergency doctrine.[1]

As the majority opinion recognizes, a warrantless search of a residence is presumptively unreasonable. *See, e.g., United States v. Karo*, 468 U.S. 705, 714-15 (1984). We have, however, permitted a narrow exception to that rule when the conditions of an emergency are present. *United States v. Cervantes*, 219 F.3d 882 (9th Cir. 2000). The first required condition for an emergency search is that the "police officers have 'reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance' " to preserve life or protect against serious bodily injury. *Id.* at 889 (quoting *People v. Mitchell*, 347 N.E.2d 607, 609 (N.Y. 1976)).[2] I conclude that this requirement has not been met here.

The fire alarm inspector and maintenance man who serially first entered the apartment were confronted with a strong smell that was strongest in the bathroom, and saw blood and feces strewn about. They were justifiably appalled by the mess and opined that there could be a dead body in the apartment and they would never know. Neither in the living room, the bedroom or the bathroom did either of these men see a

---

[1] If my view that the search was unconstitutional had prevailed, it would have been unnecessary to deal with Stafford's challenge to his sentence. My view did not prevail, however, and I therefore concur in the majority's treatment of the sentencing issue and in the limited remand.

[2] In *Cervantes*, we adopted the three conditions for an emergency set forth in *Mitchell*, 347 N.E.2d at 609, with one modification. *Mitchell*'s first condition referred to the immediate need for "protection of life or property." *Id.* In *Cervantes* we ruled that preservation of life or protection against serious bodily injury would qualify for the emergency exception, but we left open the "more difficult question" whether protection of property would suffice. *Cervantes*, 219 F.3d at 889 n.7.

body, and they did not tell the police that they had seen a body. Indeed, the maintenance man said that the statement that there could be a body in the apartment was just an indication of what a mess there was. The fire alarm inspector was concerned about the possible presence of a body because of a smell that he thought could be decaying meat or flesh. Both men conveyed their concerns to the officers before the search.

On this highly speculative evidence, it was not objectively reasonable to believe that there was a body in the apartment. Even if that point is open to argument, however, there was certainly no objectively reasonable ground for believing that emergency assistance of the officers was required. The cases holding that the report of a body suffices to create an emergency are grounded in the proposition either that the "body" might not be quite dead, *see United States v. Richardson*, 208 F.3d 626, 631 (7th Cir. 2000), or that other injured persons or a murderer might be present, *see Mincey v. Arizona*, 437 U.S. 385, 392 (1978). Here, there was no objective support for either possibility. There was blood, but it was dried and explainable by the presence of syringes. There was a smell, but bodies that are not quite dead do not smell like rotting meat. *See Richardson*, 208 F.3d at 631 (upholding search based 911 upon report of a rape and murder and the location of the body, and noting that "[t]his is not a case where the report indicated that the body had been languishing in the house for several days."). In fact, the smell was more readily explained by the maintenance man's observation, communicated to the police, that the toilet in the bathroom was stopped and there were feces about. There was no reason to believe that anyone was alive in the apartment and in need of assistance; the fire inspector had loudly knocked or announced his entrance before entering any of the rooms, and had seen no evidence that anyone was in the apartment.

Indeed, the officers did not act as if their emergency assistance was required. It was over half an hour after the arrival of the first officer on the scene that the police entered the

apartment. In the meantime, they ran license plate checks on vehicles believed possibly to be connected with the apartment, and they conferred with the management of the apartment. It is true, as the majority opinion here says, that some delay does not necessarily negate the existence of an emergency, but in the present circumstances, when others had already entered the apartment and found no live (or dead) persons home, the delay suggests the lack of an emergency. Although the officers' subjective belief may not enter into the determination whether the first, objective requirements of an emergency are met, *see Richardson*, 208 F.3d at 630, the officers' conduct does go to the second requirement of an emergency, to which I now turn.

The second requirement for a permissible emergency search is that " '[a] search must not be primarily motivated by intent to arrest and seize evidence.' " *Cervantes*, 219 F.3d at 890 (quoting *Mitchell*, 347 N.E.2d at 609). Although there was no direct evidence of a body or another possible victim or injured person in the apartment, there was a good deal of evidence of crime known to the officers before they conducted their search. The fire alarm inspector and the maintenance man reported to the officers that, in the bathroom of the apartment, they had seen hundreds or even thousands of syringes, along with what the fire alarm inspector described as a bunsen burner.[3] The fire alarm inspector and maintenance man had also seen blood, which was consistent with intravenous drug use. The condition of the apartment itself was highly consistent with heavy drug use. The fire alarm inspector also told the police that he had seen a gun clip or magazine in the apartment.

---

[3]The fire alarm inspector testified that he believed that there had been drug activity and he suspected a methamphetamine lab, but the officers testified that by the time of the search they did not believe they were dealing with a methamphetamine lab. There is no suggestion that the officers had reasonable grounds for believing that there was a danger of explosion, which methamphetamine labs often present. *See Cervantes*, 219 F.3d at 891.

The assistant apartment manager also told the officers before the search that the apartment in question was rented to a woman but that a man had also been living there. The manager told the woman that she could either identify the male occupant and put him on the lease or could pay an extra $100 per month if she wished him to remain anonymous. The woman had chosen to pay the extra $100!

In short, there was clearly probable cause to believe that evidence of crime was to be found in the apartment, but very little reason to believe that an emergency entrance was required. Although I recognize the deference owed to the findings of the district court regarding the underlying facts, on the totality of circumstances I cannot accept a conclusion that this was a true emergency search and not a search for evidence of crime. To my mind, this is exactly the kind of a situation that requires the decision of a neutral magistrate to determine the propriety of a search.

There is no question that the procedures for a telephonic search warrant were in place. The officers were on the scene and the situation in the apartment was not changing. In my view, they were required to secure a warrant before entering the apartment. *See United States v. Alvarez*, 810 F.2d 879, 882-84 (9th Cir. 1987). Not to require a warrant in the circumstances of this case is to dilute impermissibly the protections of the Fourth Amendment. I would therefore reverse the district court's denial of the motion to suppress, and would remand to permit Stafford to withdraw his plea of guilty.