**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

MICHAEL ANTHONY TORRES,
*Defendant-Appellant.*

No. 13-50088

D.C. No.
2:10-cr-00567-AHM-4

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

CESAR MUNOZ GONZALEZ,
AKA Blanco, AKA Cesar
Gonzales, AKA Ricardo
Martines, AKA Ricardo O.
Martinez, AKA Ricardo
Martinez-Osorio, AKA Osorio
Ricardo,
*Defendant-Appellant.*

No. 13-50095

D.C. No.
2:10-cr-00567-AHM-2

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

RAFAEL MUNOZ GONZALEZ,
AKA "C", AKA Cisco, AKA
Homeboy, AKA Big Homie,
*Defendant-Appellant.*

No. 13-50102

D.C. No.
2:10-cr-00567-AHM-1

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ABRAHAM ALDANA, AKA
Listo,
*Defendant-Appellant.*

No. 13-50107

D.C. No.
2:10-cr-00567-AHM-3

OPINION

Appeal from the United States District Court
for the Central District of California
Alvin Howard Matz, District Judge, Presiding

Argued and Submitted March 8, 2016
Submission Vacated September 27, 2016
Resubmitted September 6, 2017
Pasadena, California

Filed September 6, 2017

Before: Richard R. Clifton and Sandra S. Ikuta, Circuit Judges and Frederic Block,[*] Senior District Judge.

Opinion by Judge Ikuta;
Concurrence by Judge Clifton (setting forth the majority opinion as to Appellants' challenge to Jury Instruction 50)

## SUMMARY[**]

### Criminal Law

The panel affirmed four defendants' convictions and sentences for racketeering, drug trafficking conspiracy, and related offenses involving the Puente-13 street gang.

The panel held that the district court's jury instruction for determining drug quantities under 21 U.S.C. § 841(b), which required the jury to determine drug quantities that were reasonably foreseeable to each defendant in connection with his criminal activity, was not reversible error, even though the jury was not required to find that the drug quantities related to violations that were part of a jointly undertaken criminal activity. In a separate opinion that states the majority opinion as to this issue, Judge Clifton wrote that the reasoning of *United States v. Banuelos*, 322 F.3d 700 (9th Cir. 2003), in favor of employing a disjunctive formulation for assigning an

[*] The Honorable Frederic Block, Senior District Judge for the U.S. District Court for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

individual conspirator's responsibility for drug quantity, has since been undermined. Judge Clifton wrote that en banc review will ultimately be necessary to sort out the inconsistency in the case law, but that the questions need not be resolved in this case because plain error review applies here, and any error in the jury instructions did not affect the defendants' substantial rights.

The panel held that the district court did not err in denying defendant Abraham Aldana's request for a multiple conspiracies instruction, where there was no evidence upon which the jury could rationally sustain the defense that he was a member only of separate conspiracies and not of the Puente-13 conspiracy.

The panel rejected the defendants' argument that because their state convictions overlap temporally with their convictions in this case, the state convictions cannot be considered "prior" convictions that trigger sentencing enhancements under § 841(b). The panel held that because the jury verdict necessarily determined that the defendants' conspiracy continued past the dates when their state convictions became final, the district court did not err in relying on the defendants' prior drug convictions to impose the mandatory minimum penalties under § 841(b).

The panel rejected the defendants' argument that 21 U.S.C. §§ 841(b) and 851 violate the Sixth Amendment as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 133 S. Ct. 2151 (2013). The panel explained that by permitting a court to find "the fact of a *prior* conviction," the Supreme Court in *Apprendi* empowered a court to determine that the conviction was prior to the case before the court.

In the portion of her opinion that constitutes a special concurrence in Judge Clifton's opinion, Judge Ikuta wrote that the panel remains bound by *Banuelos*, and that the district court therefore did not err in only requiring the jury to determine what quantities of drugs were reasonably foreseeable to each defendant in connection with his criminal activity.

## COUNSEL

H. Dean Steward (argued), San Clemente, California, for Defendant-Appellant Cesar Munoz Gonzalez.

Benjamin L. Coleman (argued), Coleman Balogh & Scott LLP, San Diego, California, for Defendant-Appellant Rafael Munoz Gonzalez.

Michael J. Treman (argued), Santa Barbara, California, for Defendant-Appellant Abraham Aldana.

Karen L. Landau, Oakland, California, for Defendant-Appellant Michael Anthony Torres.

Mack E. Jenkins (argued) and Jennifer L. Williams, Assistant United States Attorneys; Robert E. Dugdale, Chief, Criminal Division; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

IKUTA, Circuit Judge[1]:

Rafael Munoz Gonzalez, Cesar Munoz Gonzalez, Abraham Aldana, and Michael Torres appeal their convictions and sentences for racketeering, drug trafficking conspiracy, and related offenses. We hold that the district court's jury instruction for determining drug quantities under 21 U.S.C. § 841(b) was not reversible error, even though the jury was not required to find that the drug quantities related to violations that were part of a jointly undertaken criminal activity. Nor did the district court err in denying a defendant's request for an instruction on multiple conspiracies where the evidence did not show that the defendant was involved only in a separate, unrelated conspiracy. We also hold that the district court did not err in concluding that the defendants had state convictions that were prior to the conviction in this case for purposes of the § 841(b) mandatory minimum. We therefore affirm the defendants' convictions and sentences.[2]

I

Founded in 1955 in the city of La Puente in Southern California, the Puente-13 street gang is a sophisticated,

---

[1] Judge Ikuta's opinion is the opinion of the majority of the court except as to section II.A. That section constitutes Judge Ikuta's special concurrence.

[2] We reject the defendants' remaining arguments in a memorandum disposition filed concurrently with this opinion. *See United States v. Torres*, — F. App'x — (9th Cir. 2017).

vertically integrated operation involved in the manufacture, distribution, and sale of narcotics. By 2010, the gang had about 600 documented members who were organized into a number of separate divisions and maintained a large network of stash houses. Though the drug enterprise was carried out on a large scale, Puente-13's business model was simple: the gang carved out a territorial monopoly on drug distribution, then collected the revenues provided by that monopoly. Drug dealers within Puente-13's territory were expected to obtain their supply from the gang, and each was required to pay the gang a portion of their revenues. Sellers who obtained narcotics from other sources, were associated with other gangs, or refused to pay "taxes" were attacked or excluded from Puente-13's territory. Puente-13's business therefore relied on its ability to maintain monopoly control over its territory, meaning that its efforts to exclude or tax rival gangs were as important to its success as actual drug sales. Accordingly, Puente-13 used a number of means to enforce its territorial monopoly, including robberies, prison violence, assaults, kidnappings, murder, attempted murder, and drive-by shootings. Puente-13 also worked to protect its operations from law enforcement, engaging in routine counter-surveillance against law enforcement officers.

Puente-13 is subordinate to the Mexican Mafia gang, a prison-based gang that controls the sureño gangs.[3] As a subsidiary, Puente-13 remits a portion of revenues from illegal activities, especially drug proceeds, to the Mexican Mafia. Puente-13 members also act as the Mexican Mafia's agents, serving as street-level enforcers and collecting taxes from outsiders who sell drugs within Puente-13 territory.

---

[3] According to testimony at trial, a "sureño" is a person who is a soldier for the Mexican Mafia.

Beginning in the early 2000s, the Los Angeles County Sheriff's Department conducted a multi-year investigation of Puente-13. That investigation identified defendants Rafael Munoz Gonzalez, Cesar Munoz Gonzalez, Abraham Aldana, and Michael Torres as key figures in the gang. Following the conclusion of the investigation, the government presented its evidence to three separate grand juries, which resulted in a final eight-count criminal indictment.[4]

Before trial, the government filed a sentencing information under 21 U.S.C. § 851[5] alleging that each of the four defendants had prior felony drug convictions subjecting them to mandatory minimum sentences. When the

---

[4] Counts One, Two, and Seven charged all four defendants. Count One charged racketeering conspiracy under 18 U.S.C. § 1962(d); Count Two charged substantive racketeering under 18 U.S.C. § 1962(c) based on membership in Puente-13; and Count Seven charged conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846. The government alleged that the defendants committed 86 overt acts in support of their drug conspiracy. Counts three and four were omitted. Count Five charged Rafael Munoz Gonzalez and Aldana with a Violent Crime in Aid of Racketeering (VICAR), conspiracy to commit assault under 18 U.S.C. § 1959(a)(6). Count Six charged Rafael Munoz Gonzalez with a second VICAR crime, conspiracy to commit murder under 18 U.S.C. § 1959(a)(5). Counts Eight and Nine charged Rafael Munoz Gonzalez, Cesar Munoz Gonzalez, and Torres with possession with intent to distribute methamphetamine under 21 U.S.C. § 841, and possession of a firearm in furtherance of a drug trafficking offense under 18 U.S.C. § 924(c), respectively. Count Ten charged Torres with possession of a firearm by a convicted felon under 18 U.S.C. § 922(g).

[5] Section 851 provides that in order for a defendant to receive increased punishment based on the defendant's prior convictions, the government must first identify those prior convictions by filing an information with the court and serving a copy on the defendant before trial. 21 U.S.C. § 851(a)(1).

government files an § 851 information, defendants may be subject to an increased statutory minimum sentence under 21 U.S.C. § 841, which sets terms of imprisonment based on the drug quantities and prior convictions of each defendant. 21 U.S.C. § 841(b). The first § 851 information alleged that Cesar Munoz Gonzalez had two prior drug convictions: a 1995 conviction for Possession of Cocaine Base for Sale under section 11351.5 of the California Health and Safety Code, and a 2000 conviction for Possession for Sale of Methamphetamine under section 11378 of the California Health and Safety Code. It also alleged that Aldana had one prior drug conviction, a 2002 conviction for Possession for Sale of Methamphetamine under section 11378 of the California Health and Safety Code. Finally, the first § 851 information alleged that Torres had a 1994 conviction for Possession of Cocaine under section 11350(a) of the California Health and Safety Code. The second § 851 information addressed Rafael Munoz Gonzalez's prior offenses, alleging that he had a 1989 conviction for Possession with Intent to Distribute Crack Cocaine under 21 U.S.C. § 841(a)(1),[6] and a 2000 conviction for Possession of a Controlled Substance for Sale under section 11378 of the California Health and Safety Code.

Over the course of a 23-day trial, the government presented evidence showing the following. Rafael Munoz Gonzalez was the leader of Puente-13, as well as an important member of the Mexican Mafia. Rafael Munoz Gonzalez set

---

[6] At sentencing, the government instead relied on a 1990 conviction for conspiracy to distribute cocaine under 21 U.S.C. § 846. This error does not affect our analysis, however, because it was corrected prior to sentencing and Rafael Munoz Gonzalez was sentenced on the basis of a § 846 predicate offense.

the agenda for Puente-13 even when he was in prison, issuing orders to other gang members and receiving revenues from drug sales. As leader, he pursued an aggressive expansion strategy in order to enlarge the gang's business by expanding its territorial control. To further this strategy, Rafael Munoz Gonzalez ordered members to extort money from all drug dealers within the gang's territory. He also ordered gang members to purchase their methamphetamine exclusively from his brother, Cesar Munoz Gonzalez.

Cesar Munoz Gonzalez was the nominal leader of Puente-13 while Rafael was in prison. Like his brother, Cesar Munoz Gonzalez worked to subdue rivals, urging Puente-13 members to tax all drug dealers within their territory and to enforce taxation through extortion, assault, and murder. Cesar Munoz Gonzalez's primary responsibility was managing the production and sale of methamphetamine; he was known within the gang as a high-quantity methamphetamine dealer. In connection with his production responsibilities, Cesar Munoz Gonzalez shared a proprietary method for producing a superior and more marketable form of methamphetamine with a few trusted cohorts. Cesar Munoz Gonzalez used a stash house on Fourth Avenue in La Puente for production and storage of the product, as well as a center for methamphetamine distribution.

Abraham Aldana was a longtime Puente-13 member and one of Rafael Munoz Gonzalez's top lieutenants. Aldana's involvement in Puente-13 was twofold. With respect to the drug production and distribution aspects of the business, Aldana personally purchased methamphetamine from a Puente-13 dealer and sold methamphetamine within Puente-13's territory. Between 1998 and 2002, Aldana purchased methamphetamine five times from Andy Villa, then a Puente

13 member, and resold it from his own house. In 2008, Steven Nunez, another Puente-13 member, sold Aldana methamphetamine five times after Aldana was released from prison. Aldana, in turn, sold methamphetamine "four or five times a week." In December 2008, a law enforcement search of Aldana's residence uncovered 3.17 grams of methamphetamine.

With respect to other aspects of the business, Aldana served as Rafael Munoz Gonzalez's representative and enforcer. Among other acts, Aldana negotiated with the Mexican Mafia for additional resources to assist Rafael Munoz Gonzalez's efforts to organize attacks against rival gang members both inside and outside of prison. Aldana also personally extorted drug payments from rival gang members, collected taxes from Puente-13 members, and threatened violence if the targets failed to comply. On occasion, Aldana took cars from drug dealers in lieu of tax payments.

Michael Torres was an associate of Puente-13 and was involved primarily in transporting and delivering drugs and drug proceeds. Torres resided at Cesar Munoz Gonzalez's Fourth Avenue stash house and helped with sales and tax collection. While living at the stash house, Torres sold at least 30 pounds of methamphetamine and helped manufacture methamphetamine on numerous occasions. Torres also stored a firearm in his room at the stash house in order to protect the gang's operations.

At the conclusion of trial, the jury convicted the defendants on all counts. The district court then held individual sentencing hearings to consider the government's § 851 informations. After determining that Rafael Munoz Gonzalez and Cesar Munoz Gonzalez each had two prior drug

offenses as alleged in the § 851 informations, the district court sentenced both to the mandatory minimum sentence of life imprisonment.  The court determined that Aldana had one prior drug conviction and was subject to the mandatory minimum sentence of 20 years.  It sentenced Aldana to 324 months.  Finally, the court determined that Torres was subject to the same 20-year mandatory minimum sentence because of one prior drug conviction and to an additional five-year mandatory minimum sentence because of his conviction under 18 U.S.C. § 924.  The court sentenced Torres to 300 months.

## II

On appeal, the defendants challenge the jury instructions for Counts Seven and Eight and the district court's determination that the defendants were subject to  mandatory minimum sentences under 21 U.S.C. § 841(b).  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## A

All four defendants challenge Jury Instruction 50, which addressed the drug quantity determinations required by 21 U.S.C. § 841(b).  Under § 841, any defendant convicted of a drug offense in violation of § 841(a) "shall be sentenced" to the penalties set forth in § 841(b).  21 U.S.C. § 841(b).  Section 841(b)(1)(A) provides that "[i]n the case of a violation of [§ 841(a)] involving . . . 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers," the defendant shall be subject to one of several specified mandatory minimum sentences.  21 U.S.C.

§ 841(b)(1)(A).[7]  The alleged violations at issue were those set forth in Count Seven (which alleged that all four defendants engaged in a drug trafficking conspiracy in violation of 21 U.S.C. § 846), and those set forth in Count Eight (which charged Rafael Munoz Gonzalez, Cesar Munoz Gonzalez, and Torres with substantive drug trafficking under 21 U.S.C. § 841).  Jury Instruction 50 stated:

> If you find any defendant guilty of Count Seven or Eight of the indictment (or both), you are then to determine, as to each

---

[7] 21 U.S.C. § 841(b) states, in pertinent part:

(b) Penalties

Except as otherwise provided in [sections not relevant here], any person who violates subsection (a) of this section [enumerating unlawful drug offenses] shall be sentenced as follows:  (1)(A) In the case of a violation of subsection (a) of this section involving— . . . (viii) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

such person shall be sentenced to a term of imprisonment . . . . If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment . . . .  If any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release . . . .

defendant, which of the certain weights of
methamphetamine on the special verdict
forms the government proved beyond a
reasonable doubt was reasonably foreseeable
to each defendant in connection with his
criminal activity.

Pursuant to Jury Instruction 50, the jury made a special
finding that "it was reasonably foreseeable" to each defendant
"that the overall conspiracy involved the distribution of"
(i) 50 grams or more of "pure or actual" methamphetamine
and (ii) 500 grams or more of a mixture or substance
containing a detectable amount of methamphetamine.

On appeal, the defendants argue that Jury Instruction 50
was erroneous because it did not instruct the jury that it had
to find that the drug quantities were associated with conduct
that was in furtherance of jointly undertaken criminal activity
in addition to being reasonably foreseeable to each defendant.

In making this argument, the defendants rely on *United
States v. Becerra*, 992 F.2d 960 (9th Cir. 1993). In *Becerra*,
defendants who had been part of a conspiracy to sell drugs
argued that the district court had erred in calculating the
quantity of drugs attributable to their conduct and had
therefore imposed an erroneous sentence. *Id*. at 966. Among
other things, they argued that "the evidence was insufficient
to support a finding that each 'knew or could reasonably
foresee'" that their co-defendant would negotiate a 25-
kilogram deal "or that each had agreed to a conspiracy of that
scope." *Id*. In addressing this argument, *Becerra* explained
that "[u]nder the Guidelines, each conspirator may be
sentenced only for the quantity of drugs that he reasonably
foresaw would be distributed *or* that fell within the scope of

his own agreement with his co-conspirators." *Id.* (emphasis added).**[8]** Applying this standard, we upheld the sentence of one of the defendants because the evidence at trial was sufficient for the court to find that the defendant had "participated in negotiations for the 25 kilograms or that he knew or reasonably should have foreseen that such an amount would be negotiated." *Id.* at 966–67. We reversed the sentence of the other defendant because such evidence was lacking. *Id.* at 967. In a footnote, *Becerra* then indicated that the same analysis would apply to the determination of drug quantities under § 841. *Id.* at 967 n.2. Although noting the language of § 841(b) referenced violations "involving" specified quantities of drugs, *Becerra* rejected the government's argument that § 841(b) allowed a court "to sentence a defendant based on the amount of cocaine 'involved' in an offense, rather than assessing an individual defendant's level of responsibility" because there was "no

---

**[8]** It appears that *Becerra* relied on the 1991 version of the Guidelines, which was in effect before the Guidelines were amended in November 1992. 992 F.2d at 963. The application notes to § 1B1.3 in the 1991 version provided that "[i]n the case of criminal activity undertaken in concert with others," a defendant can be held accountable for "conduct of others" that is "in furtherance of the execution of the jointly-undertaken criminal activity" and "was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, cmt. n.1 (1991). The application notes further stated that "the scope of the jointly-undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant," and therefore "[w]here it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline." *Id.* It is unclear why the Sentencing Commission imposed an "in furtherance" requirement in the affirmative formulation of the standard but then used a "within the scope" requirement in the negative formulation.

reason why sentencing under the statutory mandatory minimums should differ" from sentencing under the Guidelines. *Id.* Without further explanation, we held that the government "must show that a particular defendant had some connection with the larger amount on which the sentencing is based *or* that he could reasonably foresee that such an amount would be involved in the transactions of which he was guilty." *Id.* (emphasis added).

In *United States v. Banuelos*, we directly applied the § 1B1.3 standard addressed in *Becerra* to determinations of drug quantities under § 841(b). 322 F.3d 700, 704 (9th Cir. 2003). *Banuelos* stated that "in order to sentence [the defendant] pursuant to § 841(b)(1)(A)—or any penalty provision tied to a particular type or quantity of drug—the district court was required to find not only that the conspiracy distributed a particular type and quantity of drugs, but also that the type and quantity were either within the scope of [the defendant's] agreement with his coconspirators *or* that the type and quantity were reasonably foreseeable to [the defendant]." *Id.* (emphasis added).

In reaching this conclusion, *Banuelos* applied the disjunctive formulation of § 1B1.3(a)(1)(B) set forth in *Becerra*, even though the Sentencing Commission had amended the Guidelines in 1992 and adopted a conjunctive approach. Section 1B1.3 of the 1992 version of the Guidelines provided that "in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" would be considered "relevant conduct." U.S.S.G. § 1B1.3(a)(1)(B) (1992). The application notes reiterate this language, stating that "[i]n the case of a jointly undertaken criminal activity [§ 1B1.3(a)(1)(B)] provides that

a defendant is accountable for the conduct (acts and omissions) of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." *Id*. § 1B1.3 cmt. n.2. This formulation differed from the one considered in *Becerra* and *Banuelos* not only because it was conjunctive, but also because it required a finding that the conduct was "in furtherance of" the jointly undertaken criminal activity rather than require a finding that the conduct at issue was "within the scope" of the defendant's agreement with his coconspirators.[9]

In *United States v. Ortiz*, we recognized for the first time that the Guidelines formulation of § 1B1.3 had changed in 1992. 362 F.3d 1274, 1275 (9th Cir. 2004). We explained that under the prior version of the Guidelines, the standard for determining relevant conduct was disjunctive: "that each conspirator is to be held accountable for conduct that he reasonably foresaw *or* which fell within the scope of his particular agreement." *Id*. Under the new Guidelines language, we explained, the test was conjunctive, and we expressly held that "a district court must find that the conduct of others was *both* jointly undertaken *and* reasonably foreseeable for § 1B1.3(a)(1)(B) as revised in 1992 to apply." *Id*. at 1277.[10] (*Ortiz* did not consider the distinction between

---

[9] The Sentencing Commission again revised § 1B1.3 in 2015, adding a "within the scope" requirement. The conduct in question must now be reasonably foreseeable, in furtherance of the conspiracy, and "within the scope of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (2015).

[10] Despite our conclusion in *Ortiz*, we subsequently held that it was not plain error to use a disjunctive instruction for jointly undertaken activities under § 1B1.3 of the Guidelines. *See United States v. Reed*,

our "within the scope" requirement and the Guidelines' new "in furtherance of" requirement.) We accordingly applied the revised Guidelines standard in considering the defendant's challenge to his sentence and concluded that the district court had correctly found that the defendant was responsible for specific quantities of drugs "because they were in furtherance of the conspiracy in which [the defendant] was involved *and* of which he had knowledge." *Id.*

The defendants argue that we are now compelled to apply the conjunctive standard adopted in *Ortiz* to determine the quantities of drugs under § 841(b). The defendants reason that *Becerra* stated that there was "no reason why sentencing under the statutory mandatory minimums should differ" from the Guidelines, 992 F.2d at 967 n.2. By this logic, whenever the Sentencing Commission revises its standard for determining relevant conduct under § 1B1.3, we are bound to

---

575 F.3d 900 (9th Cir. 2009). In *Reed*, we considered the defendant's claim that there was "error in establishing his base offense level under the Guidelines," because "the special verdict form relating to the charged drug quantity" required under the Guidelines asked the jury to determine whether the drug quantity was "*either* within the scope of the defendant's agreement with his co-conspirators *or* . . . was reasonably foreseeable" to the defendant. *Id.* at 927. Under the amended Guidelines, the relevant conduct for sentencing had to be both "(i) in furtherance of the jointly undertaken criminal activity; *and* (ii) reasonably foreseeable." *Id.* (emphasis added). Without mentioning *Ortiz*, we concluded that the disjunctive formulation was not plain error for two reasons: First, the formulation was consistent with our prior opinion in *Banuelos*. *Id.* Second, the defendant could not show prejudice because he was already subject to a mandatory minimum life sentence under § 841(b)(1)(A) regardless of the applicable Guidelines range, and because the defendant had "personally received" the requisite drug quantity. *Id*. at 928. Because *Reed* did not address the standard applicable to determining drug quantities under § 841(b), it does not affect the analysis here.

change our interpretation of § 841(b) to conform to the Guidelines. According to defendants, Jury Instruction 50 therefore should have required the jury to determine what drug quantity was both "reasonably foreseeable to each defendant" and in furtherance of jointly undertaken activity.

The defendants' argument fails because neither the Sentencing Commission's 1992 revisions to § 1B1.3 nor our interpretation of § 1B1.3 in *Ortiz* constitutes intervening controlling authority that is "clearly irreconcilable" with *Banuelos*. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Revisions to the Guidelines do not themselves constitute intervening controlling authority, because the Guidelines do not affect our interpretation of a statute such as § 841. "While in some cases the sentencing guidelines may be instructive in interpreting a federal statute, nothing in the guidelines requires us to apply guideline definitions in construing a federal sentencing statute." *United States v. Liquori*, 5 F.3d 435, 438 (9th Cir. 1993) (holding that the Guidelines' definition of consolidated offenses was "not applicable" to a statutory minimum sentence imposed under § 841). Indeed, *Banuelos* itself followed *Becerra*'s interpretation of § 841(b) rather than change that interpretation to conform to § 1B1.3 as revised in 1992. We should follow the same course here. Nor does our statement in *Becerra* that we "see no reason" why sentencing under the mandatory minimums in § 841(b) should differ from sentencing under the then-mandatory Guidelines, 992 F.2d at 967 n.2, constitute a holding that our interpretation of § 841(b) must change when the Sentencing Commission revises its definition of "relevant conduct" under § 1B1.3. Rather, this comment merely explained why we rejected the government's argument that it need prove only the amount of cocaine "involved" in an offense and not the amount of drugs

for which the defendant was individually responsible. *Id.* Because there has been no intervening controlling authority overruling our interpretation of § 841(b) in *Banuelos*, we are bound by *Banuelos*'s interpretation of § 841(b) as requiring the trier of fact to find that the type and quantity of drugs "were either within the scope of [the defendant's] agreement with his coconspirators or that the type and quantity were reasonably foreseeable to [the defendant]." 322 F.3d at 704.

Although we are bound by our precedent, applying *Becerra* in this context is far from satisfactory, and we should consider revisiting this issue en banc. Because *Banuelos* relied on *Becerra*, and *Becerra* relied on the Guidelines, the rationale underlying the interpretation of § 841(b) in *Becerra* and *Banuelos* has been undermined. Moreover, *Becerra*'s reasoning is not persuasive. Among other things, we have not yet explained how our standard is consistent with the plain text of § 841(b), which requires a court to first identify the violation of § 841(a) at issue and then determine whether that violation was "involving" specified quantities of drugs. To the extent we interpret § 841(b) as requiring an analysis of when a defendant can be held liable for the conduct of co-defendants, we have not provided a reasoned explanation of why our general principles for determining co-conspirator liability do not apply to drug quantity determinations. Generally, liability for the acts of co-conspirators is determined by the *Pinkerton* doctrine, which "makes a conspirator criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy." *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002) (per curiam). A different standard applies in "establishing vicarious liability for acts establishing the crime of conspiracy *itself*," where "a conspirator who joins a

preexisting conspiracy is bound by all that has gone on before in the conspiracy." *United States v. Garcia*, 497 F.3d 964, 968 n.1 (9th Cir. 2007). It is unclear why these standards should be set aside in favor of an advisory Sentencing Guideline defining "relevant conduct," a Guidelines term not found in § 841(b). Nevertheless, despite these reasons to revisit *Banuelos*, we do "not have the authority to ignore circuit court precedent." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016). We are bound by *Banuelos* "unless and until" it is "overruled by a body competent to do so." *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001).

The majority acknowledges that we "should be careful to respect our precedent" but then declines to follow precedent here because "[t]his is not the ordinary situation." Majority at 34–35 According to the majority, we should not follow our precedent here because it is not equivalent to the Guidelines approach, and we held "on at least three separate occasions, that the same approach should be applied when analyzing culpability under § 841(b) as is applied under the Guidelines." Majority at 35. This statement is misleading, however, because the cases on which the majority relies, *Banuelos* and *United States v. Mesa-Farias*, 53 F.3d 258 (9th Cir. 1995), merely followed *Becerra*'s interpretation of § 841(b). As noted earlier, *supra* at 19, *Banuelos* faithfully followed precedent *instead* of applying the Guidelines approach: the then-effective Guidelines required application of the conjunctive approach to analyzing culpability, *see supra* at 16–17, but *Banuelos* applied *Becerra*'s disjunctive approach instead. *Banuelos*, 322 F.3d at 705. And in *Mesa-Farias*, we noted *Becerra*'s disjunctive test that "the quantity of drugs be reasonably foreseeable," but held that the test was

limited to convictions for conspiracy and did not apply to convictions for possession.  53 F.3d at 260.

Rather than follow our precedent, the majority attempts to sidestep the issue by conducting a plain error analysis, concluding that "*even if* the jury instructions were erroneous, any error by the district court did not affect the defendants' substantial rights."  Majority at 37 (emphasis added).  But this plain error analysis itself is flawed.  First, there is no colorable basis for holding that the district court erred.  We have never applied the conjunctive standard to § 841(b).  Nor have we ever required a finding that the conduct at issue was "in furtherance of" jointly undertaken criminal activity, rather than "within the scope" of the conspiracy.  Instead, we have held that the trier of fact must find that the type and quantity of drugs were "either *within the scope* of [the defendant's] agreement with his coconspirators *or* that the type and quantity were reasonably foreseeable to [the defendant]." *Banuelos*, 322 F.3d at 704 (emphasis added).  Like us, "[t]he district court does not have the authority to ignore circuit court precedent" and would have had no basis for applying the conjunctive standard to § 841(b).  *Mohamed*, 848 F.3d at 1211.

Second, the majority's plain error analysis merely adopts the *Becerra* test under a different name.  The majority reasons that had the jury been instructed to find that the quantity of drugs was "in furtherance of a jointly undertaken criminal activity" as well as being reasonably foreseeable, the jury almost certainly would have found the "in furtherance of" element because there was substantial evidence that each defendant was involved in the Puente-13 drug conspiracy. Majority at 38.  As a practical matter, this reasoning means that whenever a defendant has been convicted of a conspiracy

to distribute drugs, and the jury finds the quantity of drugs is reasonably foreseeable, it would never be plain error to omit the "in furtherance of" instruction. In effect, the majority's plain error analysis makes the "in furtherance" requirement superfluous.

Finally, the majority's approach is flawed for an institutional reason. Because it applies a plain error analysis, the majority concludes that it is "not prompted to call for our court to revisit the broader issue en banc in the context of this case because in the end it would not alter its outcome." Majority at 39. But it is our responsibility as a circuit court to clarify confusing or contradictory precedent, particularly where the majority's "plain error" resolution effectively deprives the defendants of the benefit of the "in furtherance" language to which they would be entitled under the conjunctive approach. That is what we did in *Ortiz* where we sought to "eliminate confusion" by clarifying the standard for applying the revised § 1B1.3, even though the standard did not alter the outcome in that case. *Ortiz*, 362 F.3d at 1275, 1277. Or, if the majority believes that this case is controlled by contradictory precedents which will ultimately need en banc review to sort out, Majority at 36, then under our precedent we "*must* call for en banc review" sua sponte, *United States v. Hardesty*, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc) (per curiam) (quoting *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1479 (9th Cir. 1987) (en banc)). In short, rather than effectively kick the can down the road, we should either clarify the law or make a sua sponte call for rehearing en banc.

Because we remain bound by *Banuelos*, the district court did not err in only requiring the jury to determine what quantities of drugs were reasonably foreseeable to each

defendant in connection with his criminal activity. This instruction satisfied *Banuelos*'s requirement that the trier of fact find "the quantity of drugs that either (1) fell within the scope of the defendant's agreement with his coconspirators or (2) was reasonably foreseeable to the defendant." 322 F.3d at 704.

B

Defendant Aldana challenges the jury instructions for Count Seven (conspiracy to distribute methamphetamine in violation of § 846) on a separate ground: that the district court erred because the jury instructions did not allow him to present his theory that he was involved in a separate conspiracy unconnected to the actions of the other defendants. At trial, several defendants (including Aldana) asked the district court to include Ninth Circuit Model Criminal Jury Instruction 8.22 on "multiple conspiracies," which states:

> You must decide whether the conspiracy charged in the indictment existed, and, if it did, who at least some of its members were. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.

The district court denied the defendants' request for this instruction at trial. It explained that such an instruction may be required "if the defendants were involved only in a minor conspiracy unrelated to the overall conspiracy." In this case, however, the court indicated that rather than showing individual drug conspiracies, "the evidence has been plentiful and consistent that Puente 13 was an enterprise with certain specified objectives" including drug dealing, gang welfare or maintenance, and gang structure.

Aldana argues that the district court erred in declining to give a multiple conspiracies instruction because based on the evidence at trial, a jury could have rationally concluded that his drug distribution activities were not part of the Puente-13 conspiracy described in Count 7, but rather comprised separate conspiracies involving different co-conspirators. According to Aldana, the government presented evidence that Aldana personally took part in only two sets of transactions directly involving methamphetamine possession and distribution: the 1998–2002 purchases and sales (based on Villa's testimony) and the 2008 purchases and sales (based on Nunez's testimony). *See supra* at 10–11. Aldana claims that the government failed to connect either of these sets of transactions with the activities of the other named defendants, and therefore failed to show that Aldana had anything other than individual agreements with Villa and Nunez. Accordingly, Aldana claims, the district court erred in denying his request for the § 8.22 multiple conspiracies instruction.

We disagree. "A defendant is entitled to an instruction on his theory of the case if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *United States v. Morton*, 999 F.2d 435, 437

(9th Cir. 1993). A trial court need not provide an instruction if "the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense." *United States v. Dorrell*, 758 F.2d 427, 430 (9th Cir. 1985). A defendant is entitled to a multiple conspiracies instruction "where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were *only* involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir. 1989) (emphasis added). Accordingly, Aldana would have been entitled to a multiple conspiracies instruction if there were evidence from which the jury could rationally conclude that Aldana was not involved in the conspiracy described in Count 7, but was *only* involved in separate conspiracies unrelated to the Count 7 conspiracy.

Here, there was no evidence presented at trial from which the jury could have rationally concluded that Aldana was only involved in a separate conspiracy. Both Nunez and Villa were, like Aldana and the other defendants, members of Puente-13 and obtained methamphetamine from Puente-13 suppliers. Further, Aldana's relationship with Nunez in particular extended well beyond the drug deals described at trial. Nunez testified that he regularly worked with Aldana on behalf of Rafael Munoz Gonzalez and that Aldana took over Nunez's position as chief lieutenant when Aldana got out of prison. According to Nunez's testimony, Nunez and Aldana worked together to locate drug dealers who had failed to pay taxes and were in hiding. They had six or seven confrontations with such dealers, and took their cars in lieu of cash payments. Nunez spoke to Aldana in prison multiple

times regarding Puente-13 business, and Aldana used Nunez as a conduit to communicate with Rafael Munoz Gonzalez.

Even if Nunez and Villa were not involved in all aspects of the conspiracy alleged in the indictment, Aldana's interactions with them furthered the Puente-13 conspiracy because they contributed to the gang's efforts to distribute drugs and to control drug-related activities within its territory. "A single conspiracy may involve several subagreements or subgroups of conspirators." *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984); *see also United States v. Perry*, 550 F.2d 524, 533 (9th Cir. 1977) ("To suggest that defendants should be acquitted of the general conspiracy charge just because some of them met singly with other defendants and conspired with them to carry out the overall common distribution plan is a misapplication of the law of conspiracy."). Further, Aldana did not adduce any testimony or other evidence at trial that undercut the government's evidence regarding Aldana's activities in furtherance of Puente-13's objectives.[11] Absent such testimony, there is no "evidence upon which the jury could rationally sustain the defense" that Aldana was a member only of separate conspiracies and not of the Puente-13 conspiracy. *United States v. Jackson*, 726 F.2d 1466, 1468 (9th Cir. 1984) (per curiam). Accordingly, the district court did not err by denying Aldana's request for a multiple conspiracies instruction.

---

[11] On appeal, Aldana does not argue that the Puente-13 conspiracy did not exist or that he was not a member of it, and so does not explain how he is entitled to the multiple conspiracies instruction that he seeks, which allows a jury to find a defendant not guilty if the charged conspiracy did not exist or the defendant was not a member.

III

All four defendants challenge the district court's imposition of mandatory minimum sentences under 21 U.S.C. § 841. Section 841(a) makes it unlawful for any person "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Where a violation of § 841(a) involved 50 or more grams of methamphetamine or 500 or more grams of a substance "containing a detectable amount of methamphetamine," a defendant with a prior conviction for a felony drug offense "shall be sentenced to a term of imprisonment which may not be less than 20 years," while a defendant with two or more prior convictions for a felony drug offense "shall be sentenced to a mandatory term of life imprisonment without release." *Id*. § 841(b)(1)(A)(viii).

In this case, all four defendants were convicted under 21 U.S.C. § 846 of conspiracy to violate § 841(a)(1). Section 846 provides that "[a]ny person who . . . conspires to commit any offense defined in [§ 841] shall be subject to the same penalties" as a person who violates § 841(a). Each of the defendants was therefore subjected to an enhanced sentence under § 841(b)(1)(A)(viii) because of the drug quantity and their prior conviction or convictions. The defendants raise two challenges to the use of their prior state convictions to subject them to mandatory minimum sentences.

A

First, the four defendants jointly argue that their prior state convictions did not trigger sentencing enhancements under § 841(b) because they were not committed "prior" to the offense for which they were convicted in this case. The

defendants point out that some of the conduct alleged in Count Seven occurred prior to 2003 and argue that this pre-2003 conduct also underlays the state convictions that were used to enhance their sentences under § 841(b). Because the defendants' state convictions overlap temporally with their convictions in this case, the defendants argue that the state convictions cannot be considered "prior" to the offense of conviction in this case.

We disagree. In *United States v. Baker*, the appellant similarly argued that his California state narcotics convictions could not be used to enhance his federal sentence under § 841(b) because "(1) [his] state convictions were related to the charges in the federal trial, and (2) his entire involvement in the [federal] methamphetamine conspiracy predated the finality of his state convictions." 10 F.3d 1374, 1420 (9th Cir. 1993), o*verruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000). We rejected the appellant's arguments, holding that the fact "the federal and state charges derive in part from the same activity does not preclude using the state convictions to enhance the federal sentence" where "the dates, events, and locations involved in the federal trial covered a much broader range of criminal conduct than the state convictions." *Id.* So long as the jury concludes "that [the defendant] participated in the conspiracy during the entire time period alleged in the indictment" and that period "extended beyond the date of the state convictions," the related state conviction may properly be used to enhance the defendant's sentence. *Id.* at 1421.[12]

---

[12] We reject the defendants' argument that *Baker* was overruled by *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Though *Apprendi* did overrule portions of *Baker* permitting the district court to find drug quantities for sentencing purposes, it did not address the use of prior state

Here, the jury verdict necessarily determined that the defendants' conspiracy continued past the dates when their state convictions became final. As established in the § 851 proceeding, all of the defendants' prior convictions occurred before 2003. In contrast, the indictment alleged that the conspiracy continued until "on or about June 2, 2010." Because the jury was required to find that the criminal agreement existed "on the dates set forth in the indictment" in order to convict on Count Seven, the jury's guilty verdict necessarily established that the conspiracy existed until June 2010, well past the dates that the defendants' prior convictions became final. The district court therefore did not err in relying on the defendants' prior drug convictions to impose mandatory minimum penalties under § 841(b). *Baker*, 10 F.3d at 1420–21.[13]

B

The defendants next argue that §§ 841(b) and 851 violate the Sixth Amendment as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 133 S. Ct. 2151 (2013). In those cases, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

_____

convictions to enhance federal sentences. *See Nordby*, 225 F.3d at 1059, *overruled on other grounds by United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002) (en banc).

[13] Two of our sister circuits have reached the same conclusion. *See United States v. Smith*, 451 F.3d 209, 224–25 (4th Cir. 2006) (holding that "prior felony drug convictions that fall within the conspiracy period may be used to enhance the defendant's sentence if the conspiracy continued after his earlier convictions were final"); *see also United States v. Fink*, 499 F.3d 81, 87–88 (1st Cir. 2007) (same).

statutory maximum," *Apprendi*, 530 U.S. at 490, or "increases the mandatory minimum," *Alleyne*, 133 S. Ct. at 2155, must be submitted to a jury and proved beyond a reasonable doubt. The district court, however, may find "the fact of a prior conviction." *Apprendi*, 530 U.S. at 490; *Alleyne*, 133 S. Ct. at 2168; *see also Almendarez-Torres v. United States*, 523 U.S. 224, 226–27 (1998). The defendants argue that while a court may find the existence of a "conviction," the determination that the conviction is "prior" in time must be made by the jury. Therefore, defendants argue, because § 851 permits a judge to determine whether the defendant's "prior conviction for a felony drug offense" occurred before the instant offense, it is invalid. We reject the defendants' argument. By permitting a court to find "the fact of a *prior* conviction," *Apprendi*, 530 U.S. at 490 (emphasis added), the Supreme Court empowered a court to determine that the conviction was prior to the case before the court. *United States v. Covian-Sandoval* is not to the contrary; that case merely held that the district court could not find the fact of a final judgment in a case, such as an immigration proceeding, that did not give the defendant a right to jury trial or proof beyond a reasonable doubt. 462 F.3d 1090, 1097 (9th Cir. 2006).

**AFFIRMED**.

CLIFTON, Circuit Judge, with whom Judge Block concurs:[1]

Section 841(b) sets forth the penalties to be applied for violations of the drug offenses enumerated in § 841(a). The penalties differ depending on the drug quantity "involv[ed]" in the violation of § 841(a). 21 U.S.C. § 841(b). As the portion of her opinion that is Judge Ikuta's special concurrence explains, Op. at 14–16, we first faced the question of how to assign individual responsibility for a particular drug quantity in *United States v. Becerra*, 992 F.2d 960 (9th Cir. 1993). In that case, the district court sentenced the defendants to the statutory mandatory minimum based on the drug quantity associated with their offenses. *Id.* at 963. On appeal, we explained that under the Sentencing Guidelines "each conspirator may be sentenced only for the quantity of drugs that he reasonably foresaw would be distributed *or* that fell within the scope of his own agreement with his co-conspirators." *Id.* at 966 (emphasis added).[2] The special concurrence refers to this standard as the "disjunctive formulation," and we adopt that terminology as well.

The court in *Becerra* applied that same disjunctive formulation to quantity determinations under § 841(b), "reject[ing] the government's argument that sentencing under

---

[1] This opinion states the opinion of the majority of the court as to the defendants' challenge to Jury Instruction 50. *See* Op. at 6 n.1.

[2] As the special concurrence notes, Op. at 15 n.8, the court in *Becerra* appeared to be relying on the language present in the 1991 version of the Guidelines, which provided in the application notes to § 1B1.3 that defendants should not be held accountable for conduct that "was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake." U.S.S.G. § 1B1.3 cmt. n.1 (1991).

the statutory mandatory minimums should differ from the Guidelines." *Id.* at 967 n.2. The court stated that it saw "no reason why sentencing under the statutory mandatory minimums should differ" from sentencing under the Guidelines because the statutory minimums "are, in essence, part of the Guidelines scheme." *Id.*

Our subsequent cases interpreting *Becerra* reaffirmed this aspect of its holding. In *United States v. Mesa-Farias*, 53 F.3d 258, 260 (9th Cir. 1995), we stated that *Becerra* "required . . . that sentencing for conspiracy be the same under § 841(b) as under the Sentencing Guidelines." Similarly, in *United States v. Banuelos*, 322 F.3d 700, 704 (9th Cir. 2003), a case involving a conspiracy to distribute marijuana, we referenced the disjunctive formulation applied in *Becerra* and noted that this standard was not only "well-settled as a matter of sentencing under the Guidelines" but has also been "applied . . . to sentencing under the statute of offense."

However, the disjunctive formulation was not in fact as "well-settled" as the majority in *Banuelos* suggested. As the special concurrence has explained, Op. at 16–17, by the time that case was decided, in 2003, the Guidelines had already been amended in 1992 to require that defendants be held accountable only for the conduct of others that was both "(i) in furtherance of the jointly undertaken criminal activity; *and* (ii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3 cmt. n.2 (1992) (emphasis added). We will refer to this test as the "conjunctive formulation."

We first explicitly recognized the shift in the Guidelines from the disjunctive to the conjunctive formulation in *United States v. Ortiz*, 362 F.3d 1274 (9th Cir. 2004). In that case we

wrote "to clarify the proper standard for determining relevant conduct for jointly undertaken criminal activity under USSG § 1B1.3(a)(1)(B) as amended in 1992." *Id.* at 1275. Under the new conjunctive formulation, we emphasized, "the conduct must be *both* in furtherance of jointly undertaken activity *and* reasonably foreseeable." *Id.* But because *Ortiz* was only a Guidelines case, it did not have occasion to determine whether the standard applied under § 841(b) should change along with the Guidelines standard.

We face that question directly here. The defendants' argument is straightforward. If our holdings in *Becerra*, *Mesa-Farias*, and *Banuelos* require that the same standard be applied when sentencing for a conspiracy under § 841(b) as under the Guidelines, defendants argue, then when *Ortiz* changed the test to be applied under the Guidelines, it also changed the test to be applied under § 841(b). That is a strong argument.[3]

The special concurrence would prefer to apply what it identifies as the holding of our precedents, though the logic has departed. In Judge Ikuta's view, "neither the Sentencing Commission's 1992 revisions to § 1B1.3 nor our interpretation of § 1B1.3 in *Ortiz* constitutes intervening controlling authority that is 'clearly irreconcilable' with *Banuelos*." Op. at 19 (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)). We understand this position. Each three-judge panel should be careful to respect our precedent, and as the special concurrence correctly notes,

---

[3] As the special concurrence points out, Op. at 17 n.9, the language of § 1B1.3 was revised yet again in 2015. The current version was not applicable at the time of Defendants' trial, and they do not argue that it should have been applied by the district court.

changes to the Sentencing Guidelines do not ordinarily "affect our interpretation of a statute such as § 841." Op. at 19.

This is not the ordinary situation, though. In connection with § 841(b), this court has clearly held, on at least three separate occasions, that the same approach should be applied when analyzing culpability under § 841(b) as is applied under the Guidelines. We provided no other reason in *Banuelos* for applying the disjunctive formulation to § 841(b) other than that the same test was then applied under the Guidelines. *See Banuelos*, 322 F.3d at 704. That could, therefore, also be identified as the holding of our precedents. Now that the disjunctive formulation is no longer applied under the Guidelines, the reasoning of *Banuelos* in favor of the disjunctive formulation has been completely undermined.

In support of her view that *Banuelos* remains good law, Judge Ikuta's special concurrence highlights that "*Banuelos* itself followed *Becerra*'s interpretation of § 841(b) rather than change that interpretation to conform to § 1B1.3 as revised in 1992." Op. at 19. But this argument seems more a rationalization after the fact than a description of the reasoning in *Banuelos*, as the panel in that case did not indicate that it was aware of the 1992 change in the Guidelines. Indeed, it explicitly referred to the already-outdated disjunctive formulation as "well-settled . . . under the Guidelines." *Banuelos*, 322 F.3d at 704. Furthermore, the defendant in *Banuelos* did not "dispute that the district court conducted the proper substantive inquiry" in applying the disjunctive formulation, as we noted in *Ortiz*, 362 F.3d at 1277 (quoting *Banuelos*, 322 F.3d at 704). The *Banuelos* panel did not have reason to focus its attention on the change in the Guidelines approach. That decision should not,

therefore, be understood to endorse a divergence between the standard to be applied under § 841(b) and the Guidelines. We did not appear to be aware in that decision that there was a divergence.

A similar lack of awareness appears to have infected our decision in *United States v. Reed*, 575 F.3d 900 (9th Cir. 2009). In that case we held that it was not plain error to make use of the disjunctive formulation in establishing a defendant's base offense level under the Guidelines, in spite of the contrary language in the Guidelines themselves. Our decision in *Reed* did not cite to our holding in *Ortiz* that the conjunctive formulation was required under the Guidelines, however. Instead, it held that the use of the disjunctive approach was not plain error because it was "consistent with our prior statements of the law relating to sentencing under the statutory mandatory minimum," citing to *Banuelos*. *Reed*, 575 F.3d at 927. In so doing, it appeared to endorse the result that the standard to be applied under § 841(b) differs from the applicable Guidelines standard, regardless of our court's multiple statements, including in *Banuelos* itself, that they should be the same.

Ultimately, en banc review will likely be necessary to sort the whole mess out. As the special concurrence points out, Op. at 20–21, there are other reasons to revisit some of the issues raised in *Becerra* and *Banuelos*. Even if we decide to maintain the result of *Banuelos*, that the disjunctive formulation should be applied to sentencing under § 841(b), we would have an opportunity to give reasoning for that result that makes more sense than our current undermined logic.

We do not have to resolve those questions to reach a result in this case, however. There is another basis on which we can and do hold that the convictions are affirmed on this issue. Because the defendants did not object to Jury Instruction 50 on the basis they raise here, the plain error standard of review applies. *United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc).[4] Under that standard, relief is warranted only in the presence of "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* (quoting *United States v. Cotton*, 535 U.S. 625, 631 (2002)). "If these three conditions of the plain error test are met, an appellate court may exercise its discretion to notice a forfeited error that (4) 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Cotton*, 535 U.S. at 631).

In this case, even if the jury instructions were erroneous, any error by the district court did not affect the defendants' substantial rights. In order to satisfy this prong of the test, defendants must "establish 'that the probability of a different result is sufficient to undermine confidence in the outcome of

---

[4] Defendants argue that review should be de novo because they did in fact object to the content of Jury Instruction 50. During deliberations, the jury sent a note to the district judge asking about the definition of the term "reasonably foreseeable" in the jury instructions. The defendants objected to the definition that was ultimately provided to the jury. This objection was not enough to preserve the issue of whether the district court should have used the conjunctive formulation. Defendants solely contested the definition of "reasonably foreseeable" and did not argue to the district court that the jury was *also* required to find that the drug quantity was associated with conduct undertaken "in furtherance of the jointly undertaken criminal activity." Thus, their objection was not "specific enough to 'bring into focus the precise nature of the alleged error.'" *United States v. Pineda-Doval*, 614 F.3d 1019, 1026 (9th Cir. 2010) (quoting *Palmer v. Hoffman*, 318 U.S. 109, 119 (1943)).

the proceeding.'" *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004)). Defendants have not met that burden here. Had the jury been correctly instructed that it was required to find that the drug quantities at issue were associated with conduct "in furtherance of the jointly undertaken criminal activity," it seems highly unlikely that a different result would have been reached.

Jury Instruction 50 pertained to the specific drug quantity associated with the conspiracy to distribute methamphetamine alleged in Count Seven. The government presented substantial evidence that each of the four defendants was personally involved in this drug distribution conspiracy. Rafael Munoz Gonzalez was in charge of Puente-13 and its drug distribution activities. Cesar Munoz Gonzalez managed drug production and sales. Aldana assisted in extorting drug payments from rival gangs and collecting "taxes" associated with drug distribution activities. Torres played a role in both transporting and selling the drugs. Based on this evidence, it is hard to see how a jury could find that the quantity of drugs at issue was not distributed by the gang "in furtherance of the jointly undertaken criminal activity." Drug dealing was not something that happened on the sidelines – it was the primary object of the conspiracy of which all defendants were members.

An additional factor demonstrating the lack of prejudice here is that the jury found the defendants individually responsible for conspiring to distribute the same quantity of drugs at issue in Count Seven as part of racketeering activity charged elsewhere in the indictment. With respect to the substantive racketeering offenses charged in Count Two, the jury found that each of the four defendants "committed a pattern of racketeering activity" that included conspiring to

distribute at least 50 grams of pure methamphetamine or 500 grams of a mixture or substance containing a detectable amount of methamphetamine. This conclusion would be hard to square with a jury finding that this quantity of drugs was not distributed in furtherance of a jointly undertaken criminal conspiracy.

Because relief is not warranted under the plain error standard of review, we affirm the defendants' sentences. We are not prompted to call for our court to revisit the broader issue en banc in the context of this case because in the end it would not alter its outcome. *See Go v. Holder*, 744 F.3d 604, 614 (9th Cir. 2014) (Wallace, J., specially concurring) ("[W]e have also held that even where the orderly development of our case law might benefit from an en banc review, it is not necessary to engage in such review if a particular case does not compel us to do so. Here, . . . because we arrive at the same result regardless of the level of deference provided to the [government's] interpretation of [the regulation], this case does not require us to call for en banc review[.]" (citation and internal quotation marks omitted)); *Vasquez v. Astrue*, 572 F.3d 586, 593 n.5 (9th Cir. 2009) (declining to call case en banc to resolve intra-circuit conflict when "[the] case does not require" it, even though "orderly development of the Circuit's law in [the] area might benefit from an en banc review"); *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992) ("We do not attempt to resolve [the intra-circuit] conflict in this matter because we conclude that the district court's ruling would not be erroneous under either standard.").

We remain concerned, though, about the state of our caselaw. As it stands, our precedent either is in conflict or calls for us to apply the disjunctive formulation to sentencing

under § 841(b) and the conjunctive formulation to sentencing under the Guidelines, even though we adopted the disjunctive formulation under § 841(b) in the first place to make the two approaches identical. That inconsistency cannot stand. In a case where it matters, it should be addressed en banc.